Copy

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
File No. 4:98-CV-73-H3

| | |
|---|---|
| DEBRA MORRIS BUTLER,<br>   Plaintiff<br><br>v.<br><br>SMITHFIELD FOODS,<br>INCORPORATED,<br>   Defendant | PLAINTIFF'S RESPONSE IN<br>OPPOSITION TO DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT |

NOW COMES the plaintiff in the above-entitled case, and hereby submits the following response to the motion for summary judgment submitted by the defendant herein. This memorandum is submitted along with a Notice of Filing, indicating the filing of certain depositions in this case in opposition to the defendant's motion for summary judgment.

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, generally must apply a standard of review which consider the facts, of a material nature, in the light most favorable to the non-moving party. To prevail on a motion for summary judgment, the defendant must demonstrate the absence of a genuine issue of material fact such that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). To determine whether a material fact exists:

  1. All evidence is construed in the light most favorable to the non-moving party (the plaintiff); and

  2. All reasonable inferences from the proffered evidence are drawn in favor of the plaintiff. Celotex Corp. v. Catrett, 177 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1968).

The plaintiff's version of the facts, rather than the defendant's, must be accepted as true. Simmons v. Benjamin, 77 F.3d 756 (4th Cir. 1996). The plaintiff's burden does not require her to establish that she should prevail on any issue, but only to show that the issue exists. Westover Products, Inc. v. Gateway Roofing Company, Inc., 94 N.C. App. 63 (1989). It is for the jury to determine what conclusions should be drawn from the evidence to determine whom or what to believe.

## STATEMENT OF THE FACTS

The plaintiff contends, that from the complaint in this case, the deposition of the plaintiff, the deposition of Luiz Lopez, and the deposition of Angela Thompson, that the following facts, taken in the light most favorable to the plaintiff, are relevant in respect to this case:

1.  The plaintiff herein began working at Smithfield Packing Company Plant in October of 1995 (Complaint, Paragraph 10). She was employed at the Smithfield Packing Company Plant in Kinston, North Carolina, which is a plant owned by Smithfield Foods, Inc.

2.  At that plant, there were approximately twenty nine (29) management positions. Twenty eight (28) of those positions were occupied by males, and one (1) was occupied by a female. There were a total of four (4) females employees other than production workers at the plant, including two (2) nurses, which included the plaintiff and one (1) other nurse. (Complaint, paragraph 11).

3.  The plaintiff continued her employment with Smithfield Packing at their Kinston Plant, until May 27, 1997, when she resigned her position (Complaint, paragraph 12). Prior to resigning her position, the plaintiff had been involved in voicing OSHA, FLSA, and EEO complaints against Smithfield Packing, alleging various safety violations, unfair treatment in respect to pay, sexual discrimination, and hostile work environment.

4. The plaintiff, after she was employed, was classified as an exempt employee under the Fair Labor Standards Act. There were employees who were males who were classified as exempt employees. These male exempt employees, while she was classified as such, were treated differently than she was as a female employee, in that the defendant:

(a) She was required to keep her hours and work a full day when male employees were not required to do so. (Complaint, paragraph 12(a)(1)).

(b) Male exempt employees had the right to come and go as they pleased, and not keep track of their hours. They were paid for a full eight (8) hour day, or their full salary, irrespective of whether they took time off or not. (Complaint, paragraph 2(a)(2)).

(c) Any time that the plaintiff took time off, she was either required to make up for it by working extra hours, or to take vacation therefor, as compared to males. (Complaint, paragraph 12(a)(3)).

(d) Male employees who were exempt could come in and work for one (1) hour and be paid for an entire eight (8) hour day, while the plaintiff would only be paid for the hours she worked in comparison to the male exempt employees. (Complaint, paragraph 12(a)(4)).

(e) When the plaintiff worked weekends, she was not paid in the same manner as males. Specifically, if she worked less than four (4) hours on a weekend, she was not paid for a full eight (8) hour day, while male employees were paid for the full eight (8) hour day, even though they worked less than four (4) hours on a weekend. (Complaint, paragraph 12(a)(5)).

5. The plaintiff's status was changed to non-exempt status in November of 1996. When she became an hourly employee she was paid for certain overtime pay, and eventually, received other overtime pay as the result of a lawsuit bearing File No. 4-97-CV-85-H-2 which has been resolved by the plaintiff's acceptance of defendant's offer of judgment in that case.

6. The plaintiff, even though she accepted the offer of judgment, was subjected to comments in respect to her pay of a sexual nature, specifically by the plant manager, John Oliver. These comments included the following:

(a) That the plant manager did not want to pay her, as a woman, more than he paid his male exempt employees.

(b) The plant manager did not want to pay the plaintiff more, because she was a woman, than he paid his male supervisors. (Complaint, paragraph 12(b)(2) and (3)).

7. Meanwhile, while the controversy concerning Ms. Butler's pay was going on, there were various other things which were occurring throughout the plant, which Ms. Butler felt were discrimination against here because she was a woman, which she reported to the plant manager, and for which she received no corrective action. These events included, at a **minimum** the following matters:

(a) Being subjected to a dress code established in November of 1996 for female office personnel, while male office personnel were not subjected to any specific dress code. Males wore jeans and other casual attire to work, while women were required to wear dresses, hose and other formal attire. (Complaint, paragraph 12(c)(1)).

(b) Being subjected to set lunch breaks, set breaks in the morning and afternoon, and specific hours of work, while male office workers, were not subjected to any similar types or requirements concerning their breaks or lunch hours. (Complaint, paragraph 12(c)(2)). These activities began in October of 1995 when Ms. Butler first went to work for Smithfield, and continued throughout the time that she worked there until she left her job in May of 1997.

(c) The receipt by male office workers of office reimbursement while the plaintiff did not receive such reimbursement. (Complaint, paragraph 12(c)(3)).

(d) Being subjected to constant sexually related jokes, sexually explicit statements, exhibitions of sexually specific matters, sexually explicit photographs, and demonstrations, and countless other matters that she complained of to the plant manager, none of which were corrected during the time of her employment or before she left. Some examples of this, which occurred over the entire time she was employed, include the following:

(1) Being subjected, during the course of a Christmas luncheon, which the plaintiff believes occurred in December of 1996, to a plant male employee lifting up an apron, and exposing a false penis and testicles to her which became erect when it was lifted up. This occurred in front of a large number of other men who laughed at the plaintiff, and ridiculed her. It also occurred in the specific presence of Mr. Oliver, the plant manager, who laughed along with the other men and ridiculed the plaintiff herein. (This incident is described in depth during the Deposition of Debra Butler, from pp. 154 - 183).

(2) Being subjected to naked pictures of women located at various places throughout the plant, including pictures in Ken Speight's office, in the maintenance area, and other areas throughout the plant, which existed from the time she reported to work, until the time she left in May of 1997. (These incidents are described in the Deposition of Debra Butler, from approximately pp. 183 - 195). The plaintiff complained about these pictures of naked women to the plant manager, John Oliver, who took no action whatsoever in respect thereto.

(3) Being subjected to constant comments of a sexual nature, from various supervisors in the plant, including Ken Speight, Wilbur Heath, John Oliver, and others. (Complaint, paragraph 12(d)(5-7), see also Butler Deposition pp. 196-203). Some of these comments, which were reported to John Oliver, the plant manager, who did nothing about them, were was follows:

(a) Comments by Ken Speight that he could not have women in his department because his supervisors would "f____ them to death".

(b) Comments by Wilbur Heath, another supervisor, that "Women could not work for him because he would want to stay in their pants too much".

(c) Comments by John Oliver, that women were not as valuable in the work place since they had families to take care of and had babies, and could not be to work as often.

(d) Supervisor Hank Malpass telling Ms. Butler to "get under his desk and she could get a head". (Butler deposition, p. 29).

(e) An hourly employee taking his penis out and laying it on Ms. Butler's desk when she requested him to cooperate with a drug test. (Butler deposition, pp. 92-94).

(f) Hearing repeated jokes of a sexual nature over the entire time that she was employed by Smithfield. (Butler deposition, pp. 68-69).

8. In the summer of 1996, there were complaints made to OSHA concerning certain safety matters at the plant. Mr. Oliver felt that these complaints had been generated from Debra Butler. (Lopez deposition, exhibit no. 1; Lopez testimony pp. 36 to 39).

9. In November of 1996, the plaintiff complained to the Department of Labor concerning her wages and hours. This was eventually investigated by the company, which resulted in her being paid some overtime pay and being classified in a non-exempt status. She was not, however, paid all of her overtime pay and eventually filed the Butler I lawsuit to obtain such pay.

10. In November of 1996, in response to these matters, and Butler's apparent complaints to him concerning EEO related matters, and sex discrimination, John Oliver, the plant manager,

directed Luiz Lopez, the then human resource manager to fire Debra Butler, because she was a "trouble maker". (See Lopez deposition, exhibit no. 1; Lopez deposition pp. 48 to 50; 64-90).

11. When Lopez refused to fire Butler, and reported the matters to higher authorities, Oliver, as the plant manager, began to embark upon a course of conduct, which Lopez believed to be retaliation and harassment against Butler for making her complaints and for insisting on equal treatment. (See deposition of Lopez, exhibit nos. 1-18 attached thereto). Some of the activity Mr. Oliver engaged in, included the following:

(a) The plaintiff being singled out and criticized for making medical referrals, for insisting that plant procedures and regulations be followed, and for carrying out various safety programs. Eventually, Oliver attempted to remove all safety functions from her job assignment. (Complaint, paragraph 12(e)(3)); see also deposition of Luiz Lopez and Angela Thompson).

(b) The plaintiff being criticized for requiring that male supervisors apply plant policies and procedures, specifically in respect to accompanying employees who were injured to the nurse's office. (Complaint, paragraph 12(e)(4)).

(c) Being subjected to constant changes in respect to hours for the clinic and breaks, along with being subjected to constant spying and being required to account for every minute of her time. (See Thompson, Butler and Lopez depositions).

(d) Being told, after she filed a lawsuit against the company concerning her pay under the FLSA by the human resources officer, Sherman Gilliard, that she would "never get out of that hole", and being asked whether she was not afraid to come on the property to come to work after filing such lawsuit. (Butler deposition, pp. 204-205).

(e) Being subjected to the "silent treatment" by others in the office, both from the standpoint of talking to employees and employees talking to her. (Butler deposition, pp. 204-208).

12. As a result of these matters, the plaintiff suffers various physical, emotional, and other damages, which are specifically set forth in Volume II of her deposition, from pages 216-261.

13. The human resources manager for the Smithfield Plant in Kinston, from August of 1996 through approximately March of 1997 was Luiz Lopez. According to Lopez in his deposition, he personally witnessed a good number of the actions taken against Ms. Butler for which she complained, noticed Oliver's attitude towards Ms. Butler, and felt that Ms. Butler was being constantly harassed by him as the plant manager. The harassment had reached the point that Mr. Lopez frequently referred matters to higher authorities at Smithfield, who basically told him that Oliver had been there a long complaints from Debra Butler. (See deposition of Luiz Lopez and exhibits attached thereto).

14. Butler resigned her position with Smithfield in May of 1997 and now works for Frigidaire. According to her testimony, she resigned after the treatment of her at the Smithfield Plant had become intolerable, and specifically after she had filed her December, 1996 written grievance in respect to the matters she perceived to be unfair concerning her treatment at the Smithfield Plant without substantial changes. (Butler deposition, pp. 202-206).

## ARGUMENT

As the plaintiff understands, the defendants contend that they are entitled to summary judgment in this case on several different theories. Plaintiff will attempt to address each of the theories advanced by the defendant as presented during the course of the memorandum submitted to the Court.

I. **TIME-BARRED EVENTS**. Ms. Butler filed an initial charge of discrimination with the EEO in this case on April 25, 1997. She amended the complaint after her resignation from the company in September of 1997. The defendants contend that she is only allowed to bring up events

which occurred within 180 days before she filed the complaint with the EEO. Their contention is that October 27, 1996 is the cut off for this period.

The defendants are correct that Ms. Butler will argue that she is permitted to reach back to include acts allegedly outside of the time window for the charge, by alleging a continuing violation. In fact, her April 25, 1997 filing with the EEO reflects the allegation of continuing violation. The general requirement for introducing evidence concerning events which would otherwise be outside the 180 day time frame is to demonstrate an incident that occurs within the 180 day time frame that is sufficiently related so as to establish a "series of separate but related acts". Beall v. Abbot Labs, 130 F.2d 614 (4th Cir. 1997). While a specific test has not been articulated by the Fourth Circuit, there appears to be precedent in other circuits for establishing the factors which constitute continuing violations. These factors include the following:

1. Are the acts within and without the 180 day period similar in nature?
2. Were the similar acts isolated, or recurring and frequent?
3. Did the act carry such a degree of consequence so as to trigger a reasonable employee's awareness to assert her rights.

It is only in respect to the third factor that the defendant seems to argue that the plaintiff fails to meet this general test as established by Berry v. Board of Supervisors, 715 F.2d 971 (5th Cir. 1983). They contend that Ms. Butler, because she believed that she was being harassed and treated differently because of her sex should have proceeded to file her EEO claim earlier in order to establish a continuing violation.

The defendant apparently argues that any time-barred events would not be admissible as evidence in this case, and that they would be entitled to summary judgment, despite the significant number of events of sexual harassment that even they admit occurred within the 180 day period of

filing. For example, they contend that apparently Ms. Butler should be barred from introducing evidence of sexually explicit photographs, comments, gags played upon her, and incidents which occurred prior to October of 1996 despite the fact that Ms. Butler has produced substantial evidence that these exact events occurred and continued to occur until the time that she resigned from her position in May of 1997.

Other incidents in respect to the matter in which she was treated concerning her pay compared to other male supervisors occurred up until her status was correct from exempt to non-exempt sometime in the late part of November, 1996, well within the 180 day period. Mr. Oliver's attempts to fire her for making these complaints, according to Luiz Lopez, occurred in November of 1996. Comments made by Mr. Oliver in respect to women in the work place were made in response to Ms. Butler's formal grievance, filed in December of 1996. Ms. Butler, in her deposition, contended that the supervisor's comments which she specifically complained of on prior occasions, continued to be made, despite her complaints to management and specifically to the plant manager who did nothing to correct them until the time she left. Ms. Butler's complaint in respect to tuition reimbursement, and being treated differently from other males, occurred after October of 1996. The constant changes in the schedule, and the establishment of specific times for breaks for the nurses only occurred in the winter of 1996 and the spring of 1997. The dress policy that Ms. Butler complains of was adopted in November of 1996. The removal of safety related functions previously performed by Ms. Butler and by the nurses occurred during the time that Luiz Lopez was the human resources manager, from August of 1996 through March of 1997. Ms. Butler, according to her testimony, was continually subjected to the viewing of sexually explicit photographs, sexual jokes, and statements of a sexual nature despite her complaints, to the plant manager up until the day she

left in May of 1997. Ms. Butler's recollection of the "penis apron" event is that it occurred in December of 1996, while the defendant's recollection is that occurred in December of 1995.

In fact, the only evidence that the defendant can rely upon to assert that Ms. Butler's complaints are largely time-barred, is the fact that some of her complaints, in respect to the constant sexual joking, statements of a sexual nature, and exhibiting explicit photographs occurred from the time that she arrived at the plant until the time she eventually left.

While Ms. Butler did not immediately file an EEO complaint in respect to these matters, she took the appropriate action dictated by Smithfield's policies, in that she reported the activities to her immediate supervisor, Mr. Oliver, who refused to do anything about it. In the fall of 1996 and the spring of 1997, the human resources manger for Smithfield's in Kinston, Luiz Lopez, reported other incidences that he felt could constitute sexual discrimination or sexual harassment of Ms. Butler and the other nurse. Again, even though these reports were made to higher Smithfield authority, no appropriate corrective action was taken.

Ms. Butler should not be barred from asserting these continuing violations of a similar and frequent nature, many of which occurred within the 180 day period, and several of which occurred during the entire time she was employed by Smithfield.

II. MS. BUTLER'S DISPARATE TREATMENT CLAIM. The defendant correctly points out that in order to establish a disparate treatment sex discrimination claim, the plaintiff must establish that she suffered an adverse employment action and that similarly situated male employees received more favorable treatment. Harlston v. McDonnell Douglas Corp., 37 F.3d 379 (8th Cir. 1994); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed. 2d 403 (1993). An adverse employment action is generally defined as hiring, granting leave, discharging,

promoting, or compensating an individual in respect to their employment. Paige v. Dolger, 645 F.2d 227 (4th Cir., 1980), cert den., 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

Contrary to what the defendant asserts, Ms. Butler's claim in respect to her economic situation and treatment concerning the manner in which she was granted leave and compensated are not trivial matters. Ms. Butler contends, and has produced substantial evidence to support her contentions, that male exempt employees were treated differently than she was. They were granted time off on a regular basis and paid for an eight (8) hour day whether they worked that eight (8) hour day or not. Ms. Butler, on the other hand, was required to take vacation, or work other hours to make up for any time that she took off. On weekends, she was paid only for the exact number of hours that she worked, rather than being compensated for an entire day if she only worked a portion thereof. Male exempt employees, however, were paid for an entire day.

Ms. Butler was not permitted the same tuition reimbursement that male employees were given. She was not treated identically in respect to other exempt male employees in respect to the times established for her breaks, dress policy, or lunch. Even when she was changed to non-exempt status, she was paid only for her weekend hours, and not for the overtime hours that she worked during the week. These facts show disparate treatment as required by the case law.

The defendant's argument, likewise, that Ms. Butler cannot demonstrate that Smithfield's reasons for all of these actions are pretextual cannot succeed when the court examines carefully the substantial evidence that Ms. Butler has submitted in respect to pretext. The direct statements made by Mr. Oliver, for example, that he could not have his nurses paid more than his male production supervisors belies Smithfield's stated reasons for their actions. In respect to the tuition reimbursement, while Smithfield contends that they eventually issued a check to Ms. Butler, it should be noted that the check was not issued until after she ended her employment, and further

noted that Ms. Butler has never received a check nor has Smithfield produced a canceled copy of the check for the court's perusal. While Smithfield contends that production supervisors are somehow not identical employees, they advance no reason of a business nature to this court as to why these individuals should be allowed to take time off and be paid in full, while exempt female employees were not permitted to do so. They have also advanced no reason as to why these individuals should be treated differently when it came to weekend payments in addition to regular salary when they were paid for an entire day whether they worked it or not, while the female exempt employees were not similarly compensated for weekend work.

In short, Ms. Butler has forecast sufficient evidence, of not only disparate treatment, but of direct statements and incidents which refute the legitimate business arguments of the defendants, and establish pretext on their part.

  III. <u>MS. BUTLER'S HOSTILE ENVIRONMENT CLAIM IS COMPLETELY VALID</u>.
The Supreme Court, in recent cases, has redefined and clarified Title VII Civil Rights claims, involving an allegation involving actionable hostile environment, based upon sex in the workplace. In <u>Burlington Industries, Inc. v. Ellerth</u>, No. 97-569, 1998 WL 336326 (June 26, 1998) and in <u>Faragher v. Boca Raton</u>, No. 97-282, WL 336322 (1998), the Supreme Court of the United States established principles concerning the vicarious liability of an employer to a victimized employee for actionable hostile environment Title VII cases created by a supervisor with immediately or successively higher authority over the employee.

Those two cases established the principal of vicarious liability on the part of the employer when a tangible employment action was taken, and also when no tangible employment action was taken but hostile environment was claimed and demonstrated. The Court refined the principals

established in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), wherein the Court had stated:

> [When a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex... [The language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent " to strike at the entire spectrum of disparate treatment of men and women" in employment... [T]itle VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult... [A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment...

In order for Ms. Butler to establish a hostile environment claim for which the employer is vicariously liable, and she must show the environment was both objectively (in the sense that the average person placed in the plaintiff's position would find it so) and subjectively (in the sense that the plaintiff actually did find it so) offensive. See Harris v. Forklift Systems, Inc, 510 U.S. 17 (1993). In providing guidance as to whether such a hostile environment exists, the Supreme Court noted that there are several factors which may indicate a hostile work environment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance". Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). The EEOC, in their enforcement guidance, issued after the decision in Harris v. Forklift Systems, Inc., indicated that is their policy to examine "the totality of the circumstances" in hostile environment cases, previously set forth in the EEOC guidelines. The EEOC emphasizes that, in line with the Harris decision, when defining the hypothetically reasonable person "the reasonable person standard should consider the victim's perspective and not stereotype notions of acceptable behavior". See EEOC Enforcement Guidance on Harris v. Forklift Systems, Inc., 915.002, Daley Labor Reports, March 9, 1994 at D1.

As noted by the Supreme Court, Title VII is suppose to afford employees the right to work in "an environment free from discriminatory intimidation, ridicule and insult". Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986). The Court stated that "gender harassment occurs when unwelcome physical or verbal conduct creates a hostile work environment.

The Court, in Faragher and Ellerth found that the employer was always responsible vicariously when the supervisor's sexual harassment culminated in a tangible employment action. The Court went on to hold that the employer was vicariously liable for a hostile environment created by a supervisor unless the employer could prove by a preponderance of the evidence:

    1.    That it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

    2.    That the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm".

Thus, if the plaintiff herein can demonstrate a tangible employment action, as a result of a supervisor's sexual harassment, the employer is vicariously liable without defense. If the plaintiff cannot demonstrate a tangible employment action as a result of the supervisor's sexual harassment, then the employer must assert and prove the affirmative defense.

In the instant case, Ms. Butler has demonstrated a tangible employment action, because she has demonstrated an action which inflicts direct economic harm. Specifically, Ms. Butler has demonstrated that she was not provided the same economic benefits as similarly situated males for weekend work, nor was she provided the same economic benefits for similarly situated males for work conducted during the course of the week. Of course, if she can demonstrate that her discharge was a constructive discharge, then she can demonstrate the actual loss of her job as a result of the sexual harassment that she suffered at the hands of her supervisor, Mr. Oliver.

If the Court feels that Ms. Butler has not demonstrated these things, then she is still entitled to recover if she can demonstrate a hostile environment, coupled with reasonable action on her part to report it and protect herself and no action on the part of the employer to take any steps to correct it. Ms. Butler, throughout the course of the evidence presented in this case, and her complaint and deposition, indicates that she constantly complained about other supervisors' statements, attitude, jokes, and sexually explicit photographs to her supervisor, John Oliver. Mr. Oliver's reaction to this was to do nothing. Ms. Butler has also established, in the facts, that her other complaints were brought to higher authority, through Mr. Lopez, and through her speaking directly with these authorities. As a result of that, she was compensated for some weekend time that she has lost, but not provided full compensation for her pay. Furthermore, in the spring of 1997, after Ms. Butler filed these complaints, she was specifically told by the human resources manager that she would never get out of the Kinston plant, that he did not understand why she was not afraid to come to work after suing the company, and when she conveyed this to Herb DeGroft, at the corporate headquarters, similar statements were made to her by him.

Her immediate supervisor, Mr. Oliver, threatened to fire her form making EEO complaints and other complaints and directed Luiz Lopez to do so. When he found out that he could not do that, he embarked upon a course of conduct where he essentially tried to "nitpick" the plaintiff to death and force her to resign. These deliberate intentional actions were taken in order to achieve the ultimate result in respect to Ms. Butler: she resigned her position with the company in May of 1997.

Constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces that employee to quit their job". Holsey v. Armour & Company, 743 F.2d 199 (4th Cir. 1984). Two elements must be shown: the deliberateness of the employer's actions and the intolerability of the working conditions as a result thereof.

In the instant case, plaintiff contends that she has submitted sufficient evidence to the Court to show both of these elements. Clearly, the actions of Mr. Oliver in respect to Ms. Butler were done deliberately. Other actions that were taken by other personnel at the Smithfield plant were also done deliberately, and were not corrected when brought to the attention of appropriate authorities for the company. The company, in fact, (according to Luiz Lopez), refused to take any corrective action directed towards Mr. Oliver because he had been there for so long, and he had always behaved that way. The constant sexual jokes, ridicule, changes in schedule, mistreatment in respect to pay and working hours, removal of essential functions, including safety functions, and statements of a derogatory nature towards women in general, by Mr. Oliver, constitute a sufficient basis for a reasonable person, faced with the same intolerability of working conditions to have been compelled to resign. Bristol v. Daily Press, Inc., 770 F.2d 1251 (4th Cir. 1985).

The defendant does not even seriously argue that they can establish the affirmative defense to avoid vicarious liability as established by Ellerth and Faragher if the actions pled and proven by Ms. Butler amount to a hostile work environment claim where no adverse employment action is taken. Clearly, Ms. Butler took advantage of the company's provisions for reporting these matters, did so in a timely manner, and received no satisfaction therefore. In fact, according to the deposition of Lopez, the company made the affirmative decision to leave the supervisor in the same exact position and not take remedial action after being aware of his transgressions in respect to the plaintiff herein. (See Lopez deposition pp. 93 to 97).

IV. RETALIATION. Defendant lastly contends that plaintiff's retaliation claim is meritless, again on the assertion that the employee must have suffered an adverse employment action in order to claim retaliation under Title VII. This argument relies on essentially the same legal analysis as the previous argument concerning Mr. Butler's hostile environment claim. Obviously,

-17-

if Ms. Butler was constructively discharged, then she has suffered an adverse employment action which permits her to bring a retaliation claim.

Unlike the plaintiffs in the cases cited by the defendant herein, however, Ms. Butler has alleged other matters that are generally more serious in respect to retaliation. Ms. Butler was directly told by human resources manager that she should be afraid to come to work for suing the company. She was subjected to removal of essential functions, like safety, that she needed to be able to do to perform her job effectively. She was told she could not be transferred to another Smithfield plant, despite her request to be so, because she would never get out of the whole in the wall in which she found herself as a result of filing her complaints. Mr. Oliver directed Luiz Lopez to fire her for filing three justified complaints. She was subject to changes in her break times, spied upon, subjected to ridiculing statements concerning the place of women in the work force, and in fact, subjected to so much adverse treatment that the human resources officer, Luiz Lopez sought employment elsewhere largely on the basis that he believed Debbie Butler was being treated unfairly by Smithfield. (See deposition of Luiz Lopez, pp. 101-104). This type of activity, coupled with the constructive discharge of the plaintiff herein is sufficient to establish a clear retaliation claim which should not be dismissed by the Court on a summary judgment motion.

## CONCLUSION

For the above stated reasons, the plaintiff contends that the defendant's motion for summary judgment should be denied, and that this matter should be heard on all of the factual issues in the case before a jury.

Respectfully submitted this the 5th day of April, 1999.

DAVID P. VOERMAN
Attorney for Plaintiff

_____
DAVID P. VOERMAN
50 Shoreline Drive
Post Office Box 12485
New Bern, NC 28561-2485
Telephone: (252) 638-5611
Facsimile: (252) 638-6958

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment** was served upon counsel of record for the defendant by depositing the same in a properly addressed and postpaid wrapper in an official depository under the exclusive care and custody of the United States Postal Service, New Bern, North Carolina and addressed to:

> Michael C. Lord
> Joel H. Katz
> Maupin Taylor & Ellis, P.A.
> Post Office Drawer 19764
> Raleigh, North Carolina 27619-9764

This the 5th day of April, 1999.

> DAVID P. VOERMAN
> Attorney for Plaintiff

> DAVID P. VOERMAN
> 50 Shoreline Drive
> Post Office Box 12485
> New Bern, NC 28561-2485
> Telephone: (252) 638-5611
> Facsimile: (252) 638-6958